**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 10-cv-02516-WJM-KLM

AURARIA STUDENT HOUSING AT THE REGENCY, LLC, a Colorado limited liability company,

    Plaintiff,

v.

CAMPUS VILLAGE APARTMENTS, LLC, a Delaware limited liability company,

    Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS
AND GRANTING PLAINTIFF'S MOTION TO STRIKE**

---

This matter is before the Court on Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 23), and Plaintiff's Motion to Strike Exhibits A-D to Defendant's Motion to Dismiss (ECF No. 27). Both motions are fully briefed and ripe for adjudication. (*See also* ECF No. 28, 32-34.) For the following reasons, Defendant's Motion to Dismiss is DENIED and Plaintiff's Motion to Strike is GRANTED.

## I. BACKGROUND

The following allegations, contained in Plaintiff's operative Amended Complaint, are accepted as true for purposes of Defendant's Motion to Dismiss. (*See infra.*)

This action arises from an allegedly anticompetitive agreement between Defendant Campus Village Apartments, LLC and non-party University of Colorado Denver ("UCD") creating a residential location restriction for certain UCD students ("the

1

Agreement"). (ECF No. 19, ¶ 4.) Specifically, pursuant to the Agreement, most full-time domestic freshman and international students are required, during the first two semesters of their enrollment at UCD, to reside at Defendant's Campus Village Apartments complex, located approximately one-half mile from the center of UCD's Downtown Denver Campus ("the residency restriction"). (*Id.* ¶¶ 2, 22, 29, 45.) The residency restriction took effect in the fall of 2006. (*Id.* ¶¶ 22, 29.) Plaintiff Auraria Student Housing at the Regency, LLC operates an apartment complex approximately two miles from UCD's Downtown Denver Campus, and alleges that it has lost business from students who were required by the residency restriction to reside at Campus Village Apartments. (*Id.* ¶¶ 1, 66-69.)

In May 2005, in order to fund the construction of the Campus Village Apartments, Defendant issued $50.365 million in revenue bonds through the Colorado Educational and Cultural Facilities Authority ("CECFA"). (*Id.* ¶ 25.) The Official Statement for the bond issue made express reference to the residency requirement, and made clear that Defendant was the only entity obligated for repayment of the bonds. (*Id.*) Plaintiff states, on information and belief, that the residency restriction was designed to ensure minimum occupancy levels at Campus Village Apartments to enable Defendant to meet its payment obligations on the bonds issued to fund the project. (*Id.* ¶ 20, 30, 45.) Plaintiff also states, on information and belief, that UCD had no participation whatsoever in the bond offering. (*Id.* ¶ 26.)

The Complaint contains four claims for relief: (1) conspiracy to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) civil conspiracy; (3) interference with prospective business relations; and (4) interference with existing

contractual relations. (*Id.* ¶¶ 70-88.) Jurisdiction in this Court is based on federal question jurisdiction (under 28 U.S.C. § 1331) over the federal claim, and supplemental jurisdiction (under 28 U.S.C. § 1367(a)) over the state law claims. (*Id.* ¶ 10.)

Defendant now moves to dismiss the operative Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). It argues that it is entitled to dismissal of the Sherman Act claim based on the state action immunity doctrine, because the Agreement was authorized by a clearly articulated and affirmatively expressed state policy to replace competition with regulation. (ECF No. 23, at 9-11.) It also argues that the state law claims should be dismissed on the same ground, namely, no antitrust violation and therefore no wrongful conduct providing the necessary basis for the state law claims. (*Id.* at 12-13.) Defendant submitted an affidavit and four exhibits with its Motion to Dismiss. Plaintiff moves to strike those exhibits on the ground that they are not properly considered on a defendant's Rule 12(b)(6) motion to dismiss a complaint. (ECF No. 27.)

## II. ANALYSIS

### A. Motion to Strike

Before turning to Defendant's Motion to Dismiss, the Court first addresses Plaintiff's Motion to Strike in order to clarify what documentation, if any, the Court will consider on Defendant's Motion to Dismiss. In support of its Motion to Dismiss, Defendant filed an affidavit of S. Jenny Van, a law clerk at the law firm representing Defendant, and attached four exhibits to the affidavit. The exhibits are allegedly documents evidencing various agreements between CECFA, Defendant, and/or UCD.

Plaintiff moves to strike the four exhibits.

"Typically, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) concerns only the adequacy of the allegations in the complaint." *Straily v. UBS Fin. Servs., Inc.*, No. 07-cv-00884, 2008 WL 793615, at *2 (D. Colo. Mar. 24, 2008). However,

> if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Even as to such documents, however, the Court has discretion whether or not to consider them on a Rule 12(b)(6) motion to dismiss. *See Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) ("*GFF Corp.* did not purport to decide whether consideration of materials appended to a motion to dismiss is mandatory or discretionary. . . . We agree with our sister circuits that . . . the court has discretion to consider such materials.").

The Court declines to consider the exhibits attached to Defendant's Motion to Dismiss for two reasons. First, the Court cannot conclude that these are indisputably authentic copies of the documents purportedly being submitted by Defendant. "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). One such way to authenticate a document is to provide "[t]estimony [of a witness with knowledge] that a matter is what it is claimed to be." Fed. R. Evid. 901(b)(1). Here, the documents are attached to an affidavit filed by a law clerk of the law firm representing Defendant. The law clerk, S. Jenny Van, only declares that she "reviewed documents

associated with the 2008 Campus Village Apartments bond offering by the [CECFA]," and on that basis certifies that the documents are true and correct copies of what she purports them to be. The mere fact that Ms. Van "reviewed documents" she believes were "associated with the 2008 Campus Village Apartments bond offering" does not sufficiently authenticate those documents. A much surer way to authenticate the documents would have been to submit an affidavit from one of the signatories to the agreements (such as Defendant's employee (or former employee) David E. Chadwick).

Further, even if the documents had been properly authenticated, the Court would have declined to exercise its discretion to consider the documents. As Plaintiff points out, Defendant has only selected certain documents referenced in the Amended Complaint to submit to the Court. The Court declines to consider this select universe of documents at the motion to dismiss stage, and for the same reason declines to convert Defendant's Motion to a motion for summary judgment. *See Straily*, 2008 WL 793615, at *3.[1] Should either party file a motion for summary judgment after discovery of this action, the Court will consider such a motion based on a complete evidentiary record.

Plaintiff's Motion to Strike Exhibits A-D to Defendant's Motion to Dismiss is therefore GRANTED. The Court now turns to addresses the merits of Defendant's Motion to Dismiss.

---

[1] Even if the Court had denied Plaintiff's Motion to Strike and considered the four exhibits, it would have still ruled that Defendant has not carried its burden of showing that it is entitled to dismissal based on the state-action doctrine.

**B.   Motion to Dismiss**

    **1.   Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  In evaluating such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

    **2.   Analysis**

        **a.   Sherman Act Claim**

Defendant argues that the Sherman Act claim is subject to dismissal because Defendant is shielded from liability by the state action immunity doctrine.  Specifically, it argues that

> Colorado has clearly articulated and affirmatively expressed state policies that authorize the [CECFA] to issue bonds to build educational facilities,

> including student housing, empower the [CECFA] and [Defendant] to regulate any such facility to enter into contracts for the use of any such facility, and provide that the [CECFA]'s bonds shall be repaid solely from the rents and revenues of the constructed facility. [citation omitted] Thus, the controlling question is only whether, in light of Colorado's clearly articulated and affirmatively expressed state policies, the agreements between [Defendant] and [UCD] were foreseeable.

(ECF No. 23, at 9-10.)

"The state action immunity doctrine . . . exempts qualifying state and local government regulation from federal antitrust, even if the regulation at issue compels an otherwise clear violation of the federal antitrust laws." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1498 (10th Cir. 1997) (citations and quotation marks omitted). "Although the doctrine was [originally] aimed at protecting state legislatures and state supreme courts acting in their legislative capacities, it can provide protection to other individuals or entities acting pursuant to state authorization. In such situations, however, closer analysis is required to determine whether antitrust immunity is appropriate." *Id.* (citations and quotation marks omitted).

As an initial matter, there is a question as to what legal test applies to this case. Plaintiff argues that the test from *California Retail Liquor Dealers Association v. Midcal Aluminum*, 445 U.S. 97 (1980) ("*Midcal* test") applies, in which the Supreme Court established a two-part test to determine whether alleged anticompetitive conduct by a private party is immunized under the state action immunity doctrine. The two requirements under that test are: (1) "the challenged restraint must be one clearly articulated and affirmatively expressed as state policy," and (2) "the policy must be actively supervised by the State itself." *Id.* at 105 (quotation marks omitted).

Defendant, meanwhile, argues that the test from *Town of Hallie v. City of Eau*

7

*Claire*, 471 U.S. 34 (1985) ("*Town of Hallie* test") applies, in which the Supreme Court modified the *Midcal* test for cases involving municipalities.  The Supreme Court held that municipalities need only satisfy the first prong of the *Midcal* test by demonstrating that it acted pursuant to a clearly articulated and affirmatively expressed state policy.  *Id.* at 46-47.

The Tenth Circuit in *Zimomra v. Alamo Rent-A-Car* held that the *Town of Hallie* test applied to a case in which defendants – private car rental companies – were sued for antitrust violations arising from their imposition of a daily usage fee set by a City and County of Denver ordinance.  111 F.3d at 1498-1501.  The Court held that the *Town of Hallie* test applied, and not the *Midcal* test, because the private car rental companies had no discretion in imposing the fee or in setting the amount of the fee, both of which were dictated by the County ordinance.  *See id.*  The court pointed out that the plaintiff could have named the City and County of Denver as a defendant (or even as the sole defendant) in the action, and had he done so, the single-pronged *Town of Hallie* test clearly would have applied.  *Id.* at 1500.

This case is sufficiently comparable to *Zimomra* such that the Court finds it most appropriate to apply the *Town of Hallie* test to the instant action.  The anticompetitive conduct complained of in this action is the Agreement between Defendant and UCD.  If Plaintiff had sued both Defendant and UCD, or UCD alone, the *Town of Hallie* test would clearly apply.  Just because Plaintiff has chosen to sue only Defendant, a private party, does not alter the legal test this Court should apply in evaluating the Agreement.  Plaintiff argues that the "active supervision" prong of the *Midcal* test should apply because, unlike in *Zimomra*, Defendant here maintained some discretion in carrying out

the Agreement, specifically, by controlling the terms, including rental rates, for the lease agreement with UCD students. However, as Defendant argues, the rental rates Defendant charged are merely the allegedly anticompetitive *effects* of the conduct that forms the basis for this action. The allegedly anticompetitive *conduct* in this action is the Agreement between UCD and Defendant creating the residency restriction. The allegations in the Amended Complaint indicate that UCD enforced the residency restriction (ECF No. 19, ¶¶ 22-23, 37-39, 42), with little or no "discretion" left in Defendant regarding enforcement of the Agreement.[2]

The Court's analysis turns to the *Town of Hallie* test (and the first prong of the *Midcal* test), namely, whether the challenged restraint – the Agreement between Defendant and UCD creating the residency restriction – was one clearly articulated and affirmatively expressed as state policy. The Tenth Circuit's most recent decision applying the *Town of Hallie* test came earlier this year in *Kay Electric Cooperative v. The City of Newkirk, Oklahoma*, 647 F.3d 1039 (10th Cir. 2011). There, the court grappled with the question of "[h]ow clearly must a state legislature articulate its authorization of anticompetitive . . . conduct to trigger antitrust immunity?" *Id.* at 1042. Attempting to reconcile the various standards the Supreme Court has set out over the years, the *Kay Electric* court stated that, at the very least, a defendant seeking immunity

---

[2] Even if the Court were to apply the *Midcal* test, it would hold that the second prong of the *Midcal* test – active supervision by UCD – is met here. As alleged by the Amended Complaint, UCD has overseen and enforced the residency requirement by, *inter alia*, "sending letters to students referencing the [residency restriction] and indicating that non-compliance could impact their judicial and student status." (ECF No. 19, ¶¶ 22-23, 37-39, 42.) Plaintiff argues that UCD has not overseen the **terms** of the leases entered into between Defendant and UCD students. Again, as discussed above, the terms of the leases, including rental rates, are not the anticompetitive conduct at issue here. The anticompetitive conduct at issue is the residency restriction itself.

9

bears the burden "of showing that its challenged conduct was *at least* a foreseeable (if not explicit) result of state legislation." *Id.* at 1043 (emphasis in original). A previous Tenth Circuit case – *Allright Colorado, Inc. v. City & County of Denver* – framed this foreseeability test by emphasizing that "[n]onetheless, there must be a clearly articulated and affirmatively expressed state policy *to displace competition*," as opposed to merely a "neutral" expression of state policy. 937 F.2d 1502, 1507 (10th Cir. 1991) (emphasis added).

The Court proceeds to evaluate the state legislation from which Defendant argues that Agreement was foreseeable. Title 23, Article 15 of the Colorado Revised Statutes, entitled the Colorado Educational and Cultural Facilities Authority Act ("the Act"), governs the CECFA's operations. Section 102 of the Act provides,

> It is the intent of the general assembly to create the Colorado educational and cultural facilities authority to lend money to educational institutions and cultural institutions; to authorize the authority to acquire, construct, reconstruct, repair, alter, improve, extend, own, lease, and dispose of properties to the end that the authority may be able to promote the welfare of the people of this state; to authorize the authority to administer the Colorado education savings program; to permit the bonds or certificates of participation of the authority and the bonds or certificates of participation of other issuers to be designated as Colorado education savings bonds or certificates; and to vest such authority with powers to enable such authority to accomplish such purposes. It is not the intent of the general assembly to authorize the authority to operate any such educational or cultural facility.

Colo. Rev. Stat. § 23-15-102(1)(a). Section 107 of the Act lays out the general powers of the CECFA. Defendant argues that three provisions of this Section – provisions (1)(f), (1)(h), and (1)(I) – are the ones evidencing the Colorado legislature's authorization of the conduct complained of in this action. Those provisions provide:

(1) In addition to any other powers granted to the authority by this article,

>    the authority shall have the following powers: . . .
>
>    (f)  To determine, in accordance with the provisions of this article, the location and character of any facility to be financed under the provisions of this article and to acquire, construct, reconstruct, renovate, improve, alter, replace, maintain, repair, operate, and lease such facility as lessee or lessor; to enter into contracts for any and all of such purposes and for the management and operation of a facility; and ***to designate a participating educational institution or cultural institution as its agent*** to determine the location and character of a facility undertaken by such participating institution under the provisions of this article and, as agent of the authority, to acquire, construct, reconstruct, renovate, replace, alter, improve, maintain, repair, operate, lease as lessee or lessor, and regulate the same ***and to enter into contracts for any and all of such purposes*** including contracts for the management and operation of such facility; . . .
>
>    (h) To borrow money and to issue bonds, notes, bond anticipation notes, or other obligations for any of its corporate purposes and to fund or refund the same, all as provided for in this article;
>
>    (I) To establish rules and regulations, and ***to designate a participating educational institution or cultural institution as its agent to establish such rules and regulations, for the use of the facilities undertaken or operated by such participating institution*** and to employ or contract for consulting engineers, architects, attorneys, accountants, construction and financial experts, superintendents, managers, and such other employees and agents as may be necessary in its judgment and to fix their compensation; . . . .

Colo. Rev. Stat. § 23-15-107(1) (emphasis added).  Defendant argues that it is "a participating educational institution" under the statute, "designate[d]" as an "agent" of the CECFA to "enter into any contracts for any and all of such purposes including contracts for the management and operation" of the Campus Village Apartments and to "establish . . . rules and regulations" governing the use of the Campus Village Apartments.

*Kay Electric* is instructive as to this argument.  There, the Court stated,

>    [A] state's grant of a traditional corporate charter to a municipality isn't

> enough to make the municipality's subsequent anticompetitive conduct foreseeable. Municipal charters typically endow the municipality with the authority to make contracts, to buy and sell property, to enter into joint ventures. But most private corporation charters allow companies to do these same things. And natural persons win these powers simply by reaching the age of majority. Neither companies nor persons automatically take with these pedestrian powers the right to use them in an anticompetitive fashion, and there's no reason to think municipalities do either. Put simply, simple permission to play in a market doesn't foreseeably entail permission to roughhouse in that market unlawfully.

*Kay Electric*, 647 F.3d at 1043. As a result, the Court rejected the defendant's argument that it was entitled to immunity for anticompetitive conduct based on certain "general enabling statutes conferring on [the defendant] the authority to do business." *Id.* at 1044.

The broad and general legislative authorization discussed in this passage from *Kay Electric* – "the authority to make contracts, to buy and sell property, to enter into joint ventures" – is just the type of broad and general legislative authority provided to CECFA by the Colorado legislature via Colorado Revised Statute § 23-15-107(1). The authority granted to CECFA here, including, *inter alia*, the authority "to enter into contracts for any and all of such purposes" and "to establish such rules and regulations for the use of the facilities undertaken or operated by such participating institution," does not indicate a sufficiently clear articulation of a policy to displace competition. There is insufficient indication (at least at this early stage of the proceeding) that the Agreement between Defendant and UCD was sufficiently foreseeable based on the Colorado legislature's grant of these broad and general powers to CECFA.

The cases relied on by Defendant are to be distinguished. As discussed above, *Zimomra* involved a challenge to a fee charged by private rental car companies at

Denver International Airport, a fee that was required to be charged, and the amount of which was set, by a City and County of Denver ordinance. Another case relied on by Defendant – *Allright Colorado, Inc. v. City & County of Denver*, 937 F.2d 1502 (10th Cir. 1991) – involved the City and County of Denver's operation of a shuttle bus service at Stapleton International Airport and its policies, including the imposition of fees, negatively impacting private shuttle bus companies' operations. In both cases, the Tenth Circuit held that the state action immunity doctrine shielded the defendants' conduct, based on a Colorado statute which reads,

> In connection with the erection, maintenance, and operation of any . . . airport . . ., any county has the power and jurisdiction . . . to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls, together with a lien to enforce their payment . . .

Colo. Rev. Stat. § 41-4-106; *Zimomra*, 111 F.3d at 1501-03 (citing statute and emphasizing the importance of its explicit authorization "to exact and require charges, fee, and tolls"); *Allright Colorado*, 937 F.2d at 1508-09 (citing statute and emphasizing the importance of its explicit authorization "to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports" and "to exact and require charges, fees, and tolls").

Here, however, we do not have such a specific statute evidencing, for example, a state policy authorizing CECFA loan recipients to enter into exclusive agreements to better ensure that the loan provided by the CECFA is repaid. Instead, we only have very general, and neutral, authorizations to "enter into contracts" and "establish rules and regulations." As *Kay Electric* explains, the broad and general authorizations applicable in this case do not clearly articulate and affirmatively express a state policy to

displace competition.

Although Defendant does not so argue (*see* ECF No. 23, at 9-11; ECF No. 32, at 4-7), the more seemingly direct inquiry would be whether the Colorado legislature has authorized public universities, such as UCD, to enter into agreements creating such residency restrictions. Defendant does take the time in its Motion to Dismiss to provide background as to "[t]he University of Colorado and its [p]owers." (ECF No. 23, at 6-7.) However, the statutes cited by Defendant regarding the legislature's authorization of power to UCD provide that UCD is "an urban comprehensive undergraduate and graduate research university" (Colo. Rev. Stat. § 23-20-101(1)(b)) and that the University of Colorado's Board of Regents has "general supervision of the university" (Colo. Rev. Stat. § 23-20-111). These statutes certainly do not evince a legislative authorization for UCD to enter into an agreement creating a residency requirement for certain students to live at a privately-owned apartment complex not physically on the UCD campus. While such a decision by UCD is not necessarily anticompetitive or otherwise wrongful, the question before the Court is whether Defendant is entitled to immunity from antitrust liability based on the state action immunity doctrine. The Court holds, at least at this stage of the proceedings, that it is not.[3]

---

[3] While there is a significant question in the Court's view as to how discovery revealing UCD's motivation to enter into the Agreement would change its conclusion as to the applicability of the state action immunity doctrine, the Court notes there is no evidence at this stage of the proceeding as to UCD's motivation to enter into the Agreement. Defendant implies that UCD enacted the residency requirement "for the mental, physical and social development of students." (ECF No. 23, at 7.) At this point in the litigation, however, there is no evidence in support of that assertion. In fact, the Amended Complaint alleges, on information and belief, that the Agreement "[h]ad nothing whatever to do with attempting to further the educational, mental, physical or social development of affected students." (ECF No. 19, ¶ 23.b.iii.) While the Court need not accept this conclusory allegation as true, there is also no reason for the Court to assume at this early stage that the UCD official who entered into the Agreement did so for

### b. State Law Claims

As Defendant appears to concede in its Motion and Reply (ECF No. 23, at 12-13; ECF No. 32, at 10), the Court's denial of Defendant's Motion to Dismiss as to the Sherman Act claim warrants denial of the Motion to Dismiss as to the state law claims. Specifically, because Plaintiff has stated a viable Sherman Act claim based on Defendant's allegedly anticompetitive conduct in entering into the Agreement, Plaintiff has also stated viable claims of wrongfully interfering with Plaintiff's existing and prospective business relations, and civil conspiracy. The Court therefore denies Defendant's Motion to Dismiss the state law claims.

### III. CONCLUSION

Based on the foregoing, the Court hereby ORDERS as follows:

(1) Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 23) is DENIED; and

(2) Plaintiff's Motion to Strike Exhibits A-D to Defendant's Motion to Dismiss (ECF No. 27) is GRANTED.

Dated this 23rd day of November, 2011.

BY THE COURT:

William J. Martínez
United States District Judge

---

legitimate purposes.